IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VICTORIA MOLINAR,

        Plaintiff,

vs.                                          No.  03cv0205  DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's (Molinar's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 7]**, filed July 2, 2003, and fully briefed on October 16, 2003.  The Commissioner of Social Security issued a final decision denying Molinar's claim for supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

**I.  Factual and Procedural Background**

Molinar, now forty-four years old, protectively filed her application for supplemental security income benefits on September15, 2000, alleging disability due to lower back and leg problems, depression, post traumatic stress disorder, a social disorder, panic disorder, and agoraphobia. Tr. 14.  Molinar has a tenth grade education and past relevant work as a clerk in a pet boarding facility.  On October 7, 2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Molinar's impairments were severe but did not meet or equal in

severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1, Regulations No. 4.  Tr. 15.  Specifically, the ALJ reviewed Listings 1.04 A-C, 12.04 and 12.06.  *Id.*  The ALJ further found Molinar retained the residual functional capacity (RFC) for sedentary work.  Tr. 18.  As to her credibility, the ALJ found her allegations regarding her limitations were not totally credible.  *Id.*  On December 11, 2002, the Appeals Council denied Molinar's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Molinar seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Molinar makes the following arguments: (1) the ALJ failed to properly assess her mental RFC as required by Social Security Ruling 96-8p; (2) the ALJ inappropriately determined she could return to her past relevant work as kennel clerk; (3) the ALJ erred in his credibility determination; and (4) the ALJ failed to do an appropriate analysis of her pain condition as required by Social Security Ruling 96-3p.

As a preliminary matter, the Court will address the Commissioner's request to strike Molinar's "extra-record" evidence attached to her brief. The Commissioner argues the Court only has jurisdiction to review the ALJ's decision based on the certified transcript filed with the Commissioner's Answer. The Commissioner further argues the Court may only consider the new evidence attached to Plaintiff's Brief to determine whether a remand is required.

A district court may remand a case without ruling on the merits if new and material evidence comes to light and there is good cause for failing to submit such evidence in the earlier proceeding. 42 U.S.C. § 405(g).[1] A remand is appropriate if the Court determines that the new evidence would have change the Commissioner's decision had it been before him. *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991).

In this case, Molinar submitted records from Brenda L. Wolfe, a clinical psychologist who performed a psychological evaluation on May 9, 2003, at Molinar's attorney's request to support

---

[1] Section 405(g) provides in pertinent part:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).

her disability claim.  Dr. Wolfe evaluated Molinar <u>seven months after the ALJ's decision</u>.  The Court finds that this "new evidence" does not warrant a remand.  The evidence is not material, and Molinar has not shown good cause for not submitting the evidence during the administrative proceedings.  Accordingly, the Court will not consider the "new evidence."

## A.  RFC Determination

Molinar contends the ALJ failed to properly assess her Mental RFC as required by Social Security Ruling 96-8p (Assessing Residual Functional Capacity in Initial Claims).

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the <u>physical-mental</u> requirements of jobs."  20 C.F.R. pt. 404, subpt. P, app. 2, § 2000.00(c)(emphasis added).  In determining a claimant's physical abilities, the ALJ must "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).

In determining a claimant's mental RFC, the ALJ "must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 416.920a and the Listing of Impairments and document the procedure accordingly." *Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 617 (10th Cir. 1995), *see also Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996).  The ALJ documents the procedure by completing a PRT form, which the ALJ must attach to his written decision.  "[T]he record must contain substantial competent evidence to support the conclusions reached on the PRT form [, and] if the ALJ prepares the form himself, he must 'discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.'" *Winfrey*, 92 F.3d at 1024 (quoting *Cruse*, 49 F.3d at 617-18).

In this case, the ALJ found as follows:

> In December 2001, Ms. Molinar was referred to La Buena Vida, Inc., to get counseling "to support her case for disability" (Exhibit B6F). Ms. Molinar stated that she was depressed due to her physical problems. Ms. Molinar was assessed by a social worker with a dysthymic disorder, apparently based upon her statements regarding her symptoms (Exhibit B6F5). In April 2002, Ms. Molinar was described as having appropriate appearance and behavior; poor insight and judgment; depressed mood; being oriented; and exhibiting some obsessive thought content but with coherent thought processes (Exhibit B8F10). In June, Ms. Molinar described anxiety symptoms and attributed her emotional difficulties to her childhood. Ms. Molinar's social worker offered additional diagnoses of post-traumatic stress disorder, social phobia; and a panic disorder with agoraphobia. Her condition was described as unchanged in July. Ms. Molinar has no prior history of psychological or psychiatric problems and has never been hospitalized for a mental condition. She has been involved in counseling for less than a year. The state agency medical consultants were not afforded the opportunity to assess Ms. Molinar (sic) mental status as she first visited the counseling center after her reconsideration decision. When her conditions are evaluated in combination under sections 12.04 and 12.06, I arrive at the following conclusion: Ms. Molinar has no more than "mild" limitations in her activities of daily living. She cares for her three children while her husband works. She drives when necessary and attends medical appointments. She shops with her family. She prepares meals and performs some housework. The evidence suggests that Ms. Molinar often does not like being around people. However, she has consistently been described as friendly, congenial and cooperative by her treating and examining sources and seems to interact appropriately with her family. No more than "moderate" limitations in social functioning are evidenced. She may be best suited to vocational environments which do not require direct interaction with the public. Ms. Molinar is of average intelligence and has reported have (sic) no difficulties watching television, reading the new paper, helping with the children's schoolwork, and performing routine tasks. I therefore find no more than "mild" limitations in concentration, persistence, and pace. No extended periods of decompensation are documented and I do not credit that any section 12.04 or 12.06 "C" criteria are fulfilled.

Tr. 16. The records from La Buena Vida indicate that, on December 24, 2001, at Molinar's initial visit to La Buena Vida, her "Presenting Problems" were documented as follows:

> Client states she was referred here to get counseling to support her case for disability. Client claims she wants disability for disability with her back and legs. Client states she is depressed because she doesn't feel she can function like others. She feels her medical problems have emotionally effected (sic) her. She doesn't leave her house, has difficulty sleeping and has a hard time getting up in the morning.
>
> The last time client was employed was at videoland in 1992; all she did was pop popcorn. Prior to that job she used to clean bathrooms at the KOA. Her back became herniated in

> 1995. Client is seeking therapy to help her with emotional problems related to her disability. The judge would not give her any assistance.
>
> Client lives with her husband and three children. She has a daughter (sic) 14, 8, and a son who is 4 ½. Her husband is a line supervisor– he woks (sic) for Waupaca & North Woods where they produce soil for gardening. She has been married for 20 years.

Tr. 180. On that day, Molinar was diagnosed as having Dysthymic Disorder and a "history of ongoing worthlessness, lifelong depression and low self-esteem" and assigned a GAF score [2] of 45 (serious symptoms or any serious impairment in social, occupational, or school functioning). Tr. 184. By July 31, 2002, the social worker noted: "Client is extremely fearful and can only rarely leave the house." Tr. 169. The social worker changed her diagnosis from Dysthymic Disorder to Post Traumatic Stress Disorder, Social Phobia and Panic Disorder with Agoraphobia. Tr. 169, 174-175 (psychiatric interview).

The record also indicates that on her October 4, 2000 Disability Report, the only impairment Molinar alleged was "back & leg (both) problems." Tr. 63. Molinar completed a Daily Activities Questionnaire on the same day and never mentioned any mental impairments other than to state that her back condition made her feel helpless, insecure and dependent on her husband and her older daughter. Tr. 80-83. Molinar also submitted a personal statement dated October 5, 2000. Tr. 84-87. In this statement, Molinar very articulately presented her case, yet there is no mention of any mental impairment. Molinar mentioned she had limited her driving due

---

[2] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR). The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).
DSM-IV-TR at 34.

to her back locking. Tr. 86. On August 15, 2002, Molinar submitted a "Claimant's Recent Medical Treatment" form and indicated she was now being treated for depression by Dr. Tim Shuster and taking Effexor 75 mg (anti-depressant). Molinar noted the "Date First Prescribed" as June 12, 2002.

     In determining Molinar's mental RFC, the ALJ failed to consider the June 12, 2002 psychiatric evaluation. Tr. 175-176. In that evaluation, Molinar reported "fears and constant excessive worry." Tr. 175. Based on his interview, the psychiatrist described Molinar as "43 y.o. [female], housebound with her variety of physical and emotional symptoms with lifelong depression exacerbated [in] 1995 . . . ." *Id.* The psychiatrist noted Molinar suffered from "attacks" described as "heart racing" and "feeling she may be dying with great apprehension and fear." Tr. 175. The psychiatrist also found Molinar suffered from chronic anxiety. *Id.* It appears that the ALJ may have believed this evaluation was done by a social worker and not given it much weight. Accordingly, the Court will remand the case to allow the ALJ to consider this psychiatric evaluation, apply the procedure set forth in 20 C.F.R. § 416.920a and *Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 617 (10th Cir. 1995), complete a PRT form, order a consultative evaluation (psychological or psychiatric), and request her treatment records from La Buena Vida.

     The Court also notes that substantial evidence supports the ALJ's finding that Molinar's "back condition is a potentially <u>pain producing impairment</u> and reasonably imposes some measure of functional deficit." Tr. 17(emphasis added). The ALJ further found Molinar retained the RFC for the performance of sedentary work involving <u>limited interaction with the public</u>. *Id.* On remand the ALJ, should consult a vocational expert to determine whether Molinar's pain

condition along with her limited ability to deal with the public, both nonexertional impairments, significantly reduce the underlying job base.

**B.  Credibility Determination**

Molinar contends the ALJ erred in his credibility determination.  Molinar further contends the ALJ based his credibility determination on her attorney's objections to undergoing a consultative examination by the agency's own physicians.  The record indicates Molinar's attorney objected to a consultative evaluation by Dr. Toner, a specialist in Occupational Medicine, and Dr. Anthony Reeve.  Tr. 100, 103.  Molinar also failed to keep her consultative evaluation appointment with Dr. G.T. Davis, an orthopedist, and failed to keep her appointment with X-ray Associates of New Mexico.  Tr. 147.  Molinar offers no explanation for her failure to keep her appointments with Dr. Davis or X-ray Associates of New Mexico.

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the

frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, and the consistency or compatibility of nonmedical testimony with objective medical evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (quotation omitted). The inability to work pain-free is not sufficient reason to find a claimant disabled. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

>In his decision, the ALJ found:
>
>Ms. Molinar has alleged chronic back problems as a contributory impairment. Ms. Molinar's treating physician declined to perform a requested consultative examination and complete range of motion and medical source statement forms on her behalf. Ms. Molinar subsequently declined to attend several consultative examinations scheduled with alternate physicians to assess the severity of her medical condition. Her claim was denied at previous levels for failure to cooperate. Imaging done in January 2001 disclosed mild disc space narrowing at L5-S1; minimal spondylosis; and mild facet hypertrophy (Exhibit B7F14). An MRI done the following month showed a small annular tear and mild diffuse disc bulge at L4-5 with no significant central stenosis. Moderate facet osteoarthropathy was present. A central disc extrusion was identified at L5-S1, also without significant central stenosis or neural foraminal narrowing (Exhibit B7F13-14). Ms. Molinar's back problems have apparently been present since 1995 when she was awarded a seven-percent impairment rating and only restricted from heavy or strenuous physical activity (Exhibit B3F). Ms. Molinar has reported chronic back pain and related symptoms to her treating physicians, but these clinic notes offer little insight into any specific functional limitations which can be attributed to her condition. Ms. Molinar's reluctance to cooperate in the Administration's attempt to specifically assess her present condition tends to undermine her overall credibility. Ms. Molinar testified that she could only walk one block, sit or stand thirty minutes to an hour and had difficulty lifting a gallon of milk. Not only are these assertions considered exaggerative in light of the objective medical evidence, but are uncorroborated by the type of information which would likely have been deduced at a consultative examination.

Tr. 15. In evaluating the severity of Molinar's back pain, the ALJ considered the objective medical evidence and cited to the record. The ALJ found "[T]he objective findings are generally mild and do not support a reasonable interpretation supporting the presence of disabling limitations. I do not accept that Ms. Molinar is often unable to leave her bed due to pain and has trouble caring for her personal needs." Tr. 17. Substantial evidence supports this finding. An

MRI done on February 1, 2001 indicates "patient did not report radiation of pain into the lower extremities on the pain diagram." Tr. 165.  The MRI findings were as follows:

> FINDINGS:
> T11 through L4: Disc space is preserved with normal signal.  No evidence of disc protrusion or extrusion.  No spinal stenosis or neural foraminal narrowing.
> L4-L5:  There is a <u>small annular tear</u> of the intervertebral disc associated with a <u>mild diffuse bulge</u>.  There is <u>no significant central stenosis</u> of the narrowing of the neural foramina.  Moderate facet osteoarthropathy is present.
> L5-S1:  The disc space is narrowed with degenerative loss of disc T2 signal.  There is a central disc extrusion with subligamentous superior migration.  The disc material appears to be contiguous, <u>a free fragment is not visualized</u>.  The superior portion of the disc material is very low in signal suggesting that it may be calcified.  While the disc material abuts the thecal sac, it <u>does not produce significant central stenosis</u>.  The neural foramina are widely patent.
>
> IMPRESSION:
> 1. Central disc extrusion with subligamentous superior migration and possible calcification at L5-S1 <u>without significant central stenosis or neural foraminal narrowing</u>.
> 2. Small annular tear at L4-5 with diffuse disc bulge.

Tr. 165-166 (emphasis added).  Molinar contends Dr. Wershaw, her treating physician until 1996, diagnosed her with a "permanent impairment due to her pain" and cites to Dr. Wershaw's medical records.  Pl.'s Mem. in Supp. of Mot. to Reverse at 2.  Molinar also claims Dr. Wershaw is an orthopedist.  However, the record indicates Dr. Wershaw is an osteopath and surgeon.

On **February 29, 1996**, Dr. Wershaw opined Molinar had "a large free fragment disc herniation at the level of L5-S1 on the left."  Tr. 123.  However, the **February 1, 2001** MRI indicated "a free fragment was not visualized" at L5-S1.  Moreover, although Dr. Wershaw found Molinar had a 7 % permanent impairment of the whole person, he only restricted her from "heavy or strenuous physical activity."  *Id.*

The ALJ also considered Molinar's activities of daily living and Ken L. Williams' July 27, 2002 evaluation.  Tr. 16.  The Court notes that the ALJ mistakenly referred to "Kevin Davis" instead of Ken L. Williams in his decision, however, it is clear the ALJ is referring to Mr.

11

Williams' evaluation.  At the time of her evaluation with Mr. Williams, a vocational consultant, Molinar reported she could "sit for 60 minutes before having to get up and move around, stand for 30 minutes, and walk for about one block . . . lift and carry up to five pounds and had no problems with simple grasping, fine manipulation, gripping, reaching, and handling, but [could not] squat, crawl, kneel, or climb ladders."  Tr. 204.  Based on the medical records and the information Molinar provided, Mr. Williams opined Molinar was "limited to the sedentary range of physical exertion."  Tr. 207.  The ALJ adopted Mr. Williams' opinion that Molinar was limited to sedentary work but rejected Mr. Williams' conclusion that "when emotional factors are considered, as indicated by the GAF score of 45, [Molinar] has lost access to 100 percent of the competitive labor market."  Tr. 208.

Finally, in terms of her refusal to undergo a consultative examination, the ALJ considered this in his credibility determination, which is proper.  Moreover, the regulations allow denial of benefits on the basis of "failing or refusing to take part in a consultative examination or test which [the agency] arrange[s] for [a claimant] to get information [the agency] need[s] to determine [a claimant's] disability . . . ."  20 C.F.R. § 416.918 (a).  Based on the foregoing, the Court finds that the ALJ's credibility determination is supported by substantial evidence.

## Conclusion

The Court will remand this case to allow the ALJ to consider the June 12, 2002 psychiatric evaluation, apply the procedure set forth in 20 C.F.R. § 416.920a and *Cruse*, complete a PRT form, order a consultative evaluation (psychological or psychiatric), and request her treatment records from La Buena Vida.  However, the Court expresses no opinion as to the extent of Molinar's impairments, or whether she is or is not disabled within the meaning of the

Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

 

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**